IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

J.K., et al.                    :        CIVIL ACTION
                                :
          v.                    :
                                :
THE COUNCIL ROCK                :
SCHOOL DISTRICT                 :        NO. 11-942

MEMORANDUM

Dalzell, J.                                December 14, 2011

        Plaintiff J.K. and her parents, M.K. and F.K., bring

this suit against the Council Rock School District ("Council

Rock" or "the District"), alleging claims under the Individuals

with Disabilities Education Improvement Act (the "IDEA" or

"Act"),[1] 20 U.S.C. §§ 1400, et seq., and § 504 of the

Rehabilitation Act, 29 U.S.C. § 729, as well as under the state

common law of contract.  The plaintiffs assert three causes of

action: (1) failure to provide J.K. a free and appropriate

education ("FAPE") in violation of 20 U.S.C. §§ 1412(a), 1414(d),

and 1415(j); (2) violation of § 504 of the Rehabilitation Act

(codified at 29 U.S.C. § 729); and (3) a state-law claim for

breach of contract arising out of the alleged breach of a

---

        [1] As our Court of Appeals explained in Ballard v.
Phila. Sch. Dist., 273 Fed. Appx. 184, 185 n.1 (3d Cir. 2008),
"[t]he IDEA was renamed the Individuals with Disabilities
Education Improvement Act, effective July 1, 2005.  For present
purposes, we will refer to the act as the IDEA."  We adopt the
same convention in this opinion, especially in light of the
parties' repeated reference to the Act as the "IDEA."

settlement agreement between the parties.  With respect to all three claims, plaintiffs urge the reversal of a decision issued on November 16, 2010 by Special Education Hearing Officer William F. Culleton, Esq. in which Hearing Officer Culleton declined to enforce the parties' agreement and ruled that the District had provided J.K. with a FAPE.  Plaintiffs also ask that the Court assert jurisdiction over their breach of contract claim.

Plaintiffs have filed a motion for judgment on the administrative record, as to which Council Rock has filed a response in opposition, and plaintiffs have filed a reply in support.  Because plaintiffs not only seek review of Hearing Officer Culleton's ruling, but an independent exercise of our jurisdiction over their contract claim, we must apply a summary-judgment standard to this latter claim and thus plaintiffs' motion has a hybrid character.  For the reasons explained below, we will deny plaintiffs' motion and instruct the parties to brief us on the continued viability of plaintiffs' claims.

I.   **Factual Background**

Our Court of Appeals has characterized "the burden of proof that a District Court must apply when an IDEA decision by a state agency is challenged [as] unusual," explaining that

> Although the District Court must make its own
> findings by a preponderance of the evidence,
> the District Court must also afford due
> weight to the [hearing officer's]
> determination.  Under this standard, factual
> findings from the administrative proceedings
> are to be considered prima facie correct, and
> if a reviewing court fails to adhere to them,
> it is obliged to explain why.  In addition,
> if a state administrative agency has heard
> live testimony and has found the testimony of
> one witness to be more worthy of belief than
> the contradictory testimony of another
> witness, that determination is due special
> weight.  Specifically, this means that a
> District Court must accept the state agency's
> credibility determinations unless the non-
> testimonial, extrinsic evidence in the record
> would <u>justify</u> a contrary conclusion.

Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d

Cir. 2004) (emphasis in original) (quotation marks, brackets, and

citations omitted).  "A federal district court reviewing the

administrative fact finder in the first instance is similarly

required to defer to the [hearing officer's] factual findings

unless it can point to contrary nontestimonial extrinsic evidence

on the record."  S.H. v. State-Operated Sch. Dist. of City of

Newark, 336 F.3d 260, 270 (3d Cir. 2003).  Finally, "we must view

the underlying facts and all reasonable inferences therefrom in

the light most favorable to the party opposing the motion." D.R.

v. East Brunswick Bd. of Educ., 109 F.3d 896, 898 (3d Cir. 1997)

(quotation marks and citations omitted).

As noted, however, plaintiffs not only challenge Hearing Officer Culleton's decision but also independently seek to enforce a settlement agreement with the District.  The proper standard to apply to such a motion is what we use for summary judgment.  Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record."  <u>Bello v. Romeo</u>, 424 Fed. Appx. 130, 133 (3d Cir. 2011).  In evaluating a Rule 56 motion, we "'must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence.'"  <u>Eisenberry v. Shaw Bros.</u>, 421 Fed. Appx. 239, 241 (3d Cir. 2011) (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)).

With respect to plaintiffs' challenge to the state educational agency's decision, we must accord deference to Hearing Officer Culleton's findings of facts.  As for plaintiffs' breach of contract claim, we will consider only the undisputed facts and those factual allegations that the parties support with citations to the record.  We will thus recite the facts of this

4

case in three parts: (1) the parties' stipulated facts; (2)
Hearing Officer Culleton's factual findings; and (3) plaintiffs'
additional supported factual allegations.  While this method of
presenting the facts sacrifices some narrative coherence, it will
ease the task of applying differing standards to plaintiffs'
motion.

### A.   The Stipulated Facts

J.K. is a student with a learning disability who is
eligible for special education services under the IDEA; M.K. and
F.K. are her parents.  Stip. of Facts ¶¶ 1-2.  Council Rock is a
public school district established under the Pennsylvania School
Code that is the local educational agency ("LEA") responsible for
providing J.K. with a FAPE under the IDEA.  Id. ¶ 3.

Though the parties appear to have a history that
precedes 2009, they begin their story on January 25, 2009, when
the District produced a re-evaluation report of J.K. that
summarized her many previous evaluations and identified her
educational needs.  Id. ¶ 5.  At some point, J.K. had been
"placed" at The Quaker School at Horsham,[2] a private school

---

[2] Though the parties state that J.K. was placed at The
Quaker School "for the 2009-2010 school year," Stip. of Facts ¶
(continued...)

specializing in the education of children with learning disabilities.  Id. ¶ 6.  On March 23, 2009, a meeting regarding J.K.'s individualized education program ("IEP") "was convened" at which the "IEP team"[3] presented M.K. and F.K. with a proposed IEP that would return J.K. to the District and place her at either a middle school or a high school within the District.  Id. ¶ 7.

_____

[2] (...continued)
6, this assertion is belied by their later statement that the parties agreed to place J.K. in the Lewis School "for the 2009-2010 school year."  Id. ¶ 10.  Confusingly, Hearing Officer Culleton found that "[o]n March 23, 2009, the District offered an IEP with placement in supplemental learning support for reading, writing, mathematics, science and social studies.  The placement was located at the Quaker School at Horsham," Hearing Officer's Findings of Fact ("Culleton's FF") ¶ 2 (citing Ex. 7 to Admin. R. at S-6), though the parties' stipulation suggests that on March 23, 2009, the District offered an IEP involving a public school placement.  Stip. of Facts ¶ 7.  Plaintiffs' brief in support of their motion explains that they placed J.K. at The Quaker School during her fifth grade year and that the District then agreed to place J.K. at that school during her sixth and seventh grade years, but before her eighth grade year -- i.e., the 2009-2010 school year -- the parties entered into a settlement agreement placing J.K. at the Lewis School.  Pls.' Br. in Supp. of Mot. J. on Admin. R. ("Pls.' Br.") at 3-4 (citing Ex. 5 to Admin. R. at 46-47; Ex. 7 to Admin. R. at S-1).  This suggests that J.K. attended The Quaker School during the 2006-2008 school years, but not during the 2009-2010 school year.

[3] The parties leave unspecified who convened this meeting or who comprised the "IEP team."  The parties' identification of the "IEP team" and J.K.'s parents as distinct entities appears to be incorrect under the IDEA, which provides that "[t]he term 'individualized education program team' or 'IEP Team' means a group of individuals composed of -- (i) the parents of a child with a disability . . . " 20 U.S.C. § 1414(d)(1)(B).

The parties did not reach an agreement at that meeting as to a
placement and program for J.K., so J.K.'s parents enrolled her at
The Lewis School, a private school in Princeton, New Jersey
specializing in the education of children with various learning
disabilities.  The parties did agree, however, to attend a
resolution meeting to resolve their disagreements as to J.K.'s
placement and program.  Id. ¶¶ 8-9.

        The resolution meeting convened on July 15, 2009,
"facilitated by a former special education hearing officer, Dr.
Max Wald."  Id. ¶ 10.  The meeting resulted in an agreement
between the parties providing that J.K. would be placed in The
Lewis School for the 2009-2010 school year.  Id.  J.K. attended
this school during that year.  Id. ¶ 11.

        Around December 18, 2009, in the absence of any
communication from the District, J.K.'s parents contacted the
District's Director of Special Education to inquire about the
scheduling of another IEP meeting.  Id. ¶ 12.  An IEP meeting
then convened on January 21, 2010, at which District personnel
proposed a re-evaluation of J.K. to explore whether she should be
identified as a student with mental retardation instead of her
long-standing identification as a student with learning
disabilities.  Id. ¶ 13.  Though the meeting focused on this

proposed re-evaluation, the parties did not reach an agreement as to whether such a re-evaluation was needed.  Id. ¶¶ 13-14.  Four days later, the District sent M.K. and F.K. a request for permission to evaluate J.K.  Id. ¶ 15.

At the completion of the "agreed upon observations of J.K." -- a term that the parties do not define, but which does not appear to include the District's proposed evaluation -- a second IEP meeting occurred on March 15, 2010.  Id. ¶ 16.  On March 17, 2010, the parents e-mailed Dr. Charles Lambert, the District's Director of Special Education, to express concerns about the IEP process.  Id. ¶ 17.  The District then sent to the parents an amended permission to evaluate form on March 31, 2010, which they signed and returned to the District.  Id. ¶¶ 18.

On April 8, 2010, M.K. and F.K.'s counsel sent a letter to counsel for the District that raised concerns about the District's request for permission to evaluate J.K., and on May 19, 2010, M.K. and F.K. filed a due process complaint pursuant to 20 U.S.C. § 1415(f).  Id. ¶¶ 19-20.  Another IEP meeting nonetheless occurred on July 14, 2010 at which the District proposed an IEP for J.K. for the 2010-2011 school year.  M.K. and F.K. rejected that proposal.  Id. ¶ 21.  A due process hearing convened before Hearing Officer Culleton on August 12, 2010 and

8

concluded, after three sessions, on October 29, 2010.  Hearing

Officer Culleton issued his decision on November 16, 2010.  <u>Id.</u> ¶

22.

     **B.**    **The Hearing Officer's Findings of Facts**

        We turn now to Hearing Officer Culleton's findings of

fact to supplement the facts as to which the parties agree.

Hearing Officer Culleton explains that the January, 2009

evaluation identified J.K. as having a specific learning

disability involving significant impairment in receptive and

expressive language skills.  Culleton's FF ¶ 1.  The IEP that the

District presented on March 23, 2009, moreover, offered specially

designed instruction regarding not only reading, writing, and

mathematics, but "on task behavior, organization, verbal

reasoning, following complex instructions and social skills" as

well as "oral expression, intonation, processing speed, and

working memory," <u>id.</u> ¶ 2 -- which suggests that J.K. had

specialized needs regarding these faculties as well.[4]  According

to Hearing Officer Culleton, "the IEP addressed the educational

---

        [4] Plaintiffs add that J.K. had been "consistently
identified as a student with learning disabilities and Attention
Deficit Hyperactivity Disorder (ADHD)."  Pls.' Br. at 4 (citing
Ex. 5 to Admin. R. at 53-54).

needs identified in the prior evaluation report and set forth in

the present levels section of the IEP." Id. ¶ 3.

Hearing Officer Culleton found that M.K. and F.K.

rejected the District's proposed IEP involving placements at a

public middle school or high school because J.K. would interpret

the former placement as a retention and hence be discouraged, id.

¶¶ 6-7, while the high school placement would require

> one-to-one attendance by an educational aide,
> thus reducing the Student's independence and
> constituting a less[5] restrictive environment
> than a private school with a student body
> consisting entirely of children with learning
> differences.  Parents concluded that the
> Student would be unable to navigate in a
> large high school setting without an
> attendant.  They indicated a lack of
> confidence that the District could
> differentiate teaching throughout the day
> sufficient to implement the specially
> designed instruction offered in the IEP. . .
> . The Parents knew that the goal for teaching
> the Student to navigate the high school
> building included fading of support as much
> as possible consistent with safety and
> academic progress.

Despite this rejection of the proposed IEP, Hearing Office

Culleton noted that "District personnel and Parents had a

practice of working out disagreements in IEP meetings.  District

---

[5] Reading this clause in context, it seems that Hearing
Office Culleton meant to use the word "more" here.

personnel were available to meet at parent request.  The District was ready to revise the IEP as needed."  Id. ¶ 9.

According to Hearing Officer Culleton, the settlement agreement that the parties executed in September of 2009 -- after M.K. and F.K. enrolled J.K. at the Lewis School in June of that year and after the July 15, 2009 resolution meeting "facilitated" by Dr. Wald -- provided that "the District did not agree to a pendent placement outside the District, and that . . . the pendent placement would be deemed to be the last program and placement proposed by the District."  Id. ¶¶ 11-13.  Following execution of the settlement agreement, J.K.'s parents received repeated communications from the Lewis School between December 2009 and April 2010 asking them to declare whether they intended to re-enroll J.K. at the school.  Id. ¶ 14.  The Lewis School stated that it could not hold open a placement for J.K. after the end of April of 2010.  Id.

Meanwhile, following the IEP meeting held in January of 2010, J.K. attended Intensive Learning Support classes in Council Rock North High School in February of that year.  J.K. participated in these classes on Wednesday afternoons while still attending the Lewis School.  Id. ¶ 16.  District personnel observed that though J.K. at first required assistance to

11

navigate the Council Rock high school building, she made progress in accomplishing this task and this support was consequently faded.  Id. at 17.  District personnel further observed that J.K. had been able to engage in friendly social interactions while at the high school, id., and J.K. herself reported enjoying the time she spent at the District's high school.  Id. ¶ 19.

At the same time, M.K. and F.K. were attempting to get teacher response forms from Lewis School teachers that the District sought in order to evaluate J.K.  Id. ¶ 20.  The Lewis School teachers did not respond quickly to these requests, and the District only received these teachers' responses on April 9, 2010.  Id.  On February 25, 2010, and again in March of that year, District personnel observed J.K. at the Lewis School but "[d]ue to the participation of Lewis School personnel, the observations did not yield sufficient data for District evaluation purposes as of the end of March 2010."  Id. ¶ 21.

After J.K.'s parents contacted Dr. Lambert on March 17, 2010 to request that IEP planning move forward, a series of email messages ensued, some of which broached the possibility that M.K. and F.K. might file a due process complaint.  Id. ¶ 22.  On March 30, 2010, Dr. Lambert informed the parents that though the evaluation of J.K. would proceed without cognitive testing, "the

March 2009 IEP . . . placement would be the program and placement
offered to the Parents for the 2010-2011 school year." Id.  On
April 8, 2010, M.K. and F.K.'s attorney gave the District written
notice that they would re-enroll J.K. at the Lewis School "unless
a satisfactory offer were provided." Id. ¶ 23.  M.K. and F.K.
received no response to this letter, and on April 26, 2010, they
re-enrolled J.K. at the Lewis School and executed a binding
contract to pay the full tuition.  Id. ¶¶ 23-24.  M.K. and F.K.
paid a deposit to the Lewis School in early May of 2010, and paid
the tuition in full in May and June of 2010.  Id. ¶ 25.

    C.   **Plaintiffs' Factual Disputes**

Plaintiffs provide additional factual detail in their
brief regarding an array of subjects, but their account
materially differs from, or adds to, the parties' stipulated
facts and Hearing Officer Culleton's findings of fact in only
three respects.

First, though plaintiffs concede that their settlement
agreement with the District provided that "the program and
placement that was proposed in March, 2009 would be considered
the pendent placement, for purposes of 20 U.S.C. § 1415(j), in
the event of a dispute between the parties over the 2010-2011

13

program," plaintiffs assert that "[t]he agreement further

provided that an[] IEP meeting was to be convened by November 30,

2009, [and] that an IEP was to be proposed by March 30, 2010."

Pls.' Br. at 5 (citing Ex. 6 to Admin. R. at P-1).  Plaintiffs

aver that "[t]he timelines specified in the settlement agreement

for the creation of an IEP for the 2010-2011 school year were

critical to the parents because they needed sufficient time in

which t[o] consider the proposed IEP before having to decide

whether to enroll J.K. in the Lewis School for that year."  Id.

at 5-6 (citing Ex. 5 to Admin. R. at 77-78).  Second, plaintiffs

explain that they "expected that they would be contacted by the

district prior to the November 30, 2009 date, in light of the

fact that the District typically did initiate IEP meetings."  Id.

at 6 (citing Ex. 5 to Admin. R. at 79-80).  Finally, though

Hearing Officer Culleton found that Dr. Lambert's March 30, 2010

letter explained that "the March 2009 IEP . . . placement would

be the program and placement offered to the Parents for the 2010-

2011 school year," Culleton's FF ¶ 22, plaintiffs aver that Dr.

Lambert only

> noted, in this letter, that the March 9, 2009
> IEP would serve as J.K.'s pendent placement
> while a new IEP was being developed.  The
> letter does not state that the March, 2009
> IEP was being offered as J.K.'s placement for

14

> the 2010-2011 school year.  To the contrary,
> the letter indicates that the District did
> not, at that time, have sufficient data to
> draft a new IEP.

Pls.' Br. at 7 (citing Ex. 6 to Admin. R. at P-6).


## II.  **Analysis**

        To explain the standard that we will apply to review

the hearing officer's determination, we begin with the IDEA

itself.  20 U.S.C. § 1415(f)(1)(A) explains that

> Whenever a [due process] complaint has been
> received under subsection (b)(6) or (k), the
> parents or the local educational agency
> involved in such complaint shall have an
> opportunity for an impartial due process
> hearing, which shall be conducted by the
> State educational agency or by the local
> educational agency, as determined by State
> law or by the State educational agency.

Section 1415(f)(3)(E) further provides that

> (i)  In general
>
>      Subject to clause (ii), a decision made
>      by a hearing officer shall be made on
>      substantive grounds based on a
>      determination of whether the child
>      received a free appropriate public
>      education.
>
> (ii) Procedural issues
>
>      In matters alleging a procedural
>      violation, a hearing officer may find
>      that a child did not receive a free

15

> appropriate public education only if the
> procedural inadequacies --
>
> > (I) impeded the child's right to a free
> > appropriate public education;
>
> > (II) significantly impeded the parents'
> > opportunity to participate in the
> > decisionmaking process regarding the
> > provision of a free appropriate public
> > education to the parents' child; or
>
> > (III) caused a deprivation of educational
> > benefits.

Under § 1415(i)(2)(A),

> Any party aggrieved by the findings and
> decision made under subsection (f) or (k) who
> does not have the right to an appeal under
> subsection (g), and any party aggrieved by
> the findings and decision made under this
> subsection, shall have the right to bring a
> civil action with respect to the complaint
> presented pursuant to this section, which
> action may be brought in any State court of
> competent jurisdiction or in a district court
> of the United States, without regard to the
> amount in controversy.

Finally, § 1415(i)(2)(C) explains that

> In any action brought under this paragraph,
> the court --
>
> > (i) shall receive the records of the
> > administrative proceedings;
>
> > (ii) shall hear additional evidence at
> > the request of a party; and
>
> > (iii) basing its decision on the
> > preponderance of the evidence,

16

shall grant such relief as the
court determines is appropriate.

Our Court of Appeals has emphasized that "[i]n reviewing the decision of a state agency under IDEA, the district court must make an independent determination based on a preponderance of the evidence." Oberti v. Bd. of Educ. of Borough of Clementon Sch., 995 F.2d 1204, 1219 (3d Cir. 1993) (internal quotation marks omitted). But the Supreme Court has stressed that courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review," and that § 1415(e) "carries with it the implied requirement that due weight shall be given to these proceedings." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982). As a consequence, and as we have already noted, "factual findings from the administrative proceedings are to be considered prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why," Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 199 -- a standard that our Court of Appeals has recently referred to as "'modified de novo' review." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010).

17

Plaintiffs challenge three of Hearing Officer Culleton's determinations[6]: (1) "the Hearing Officer's ruling that he lacked jurisdiction to interpret a settlement agreement that was reached through the resolution process incorporated into the IDEA," Pls.' Br. at 1; (2) "the Hearing Officer's determination that the Lewis School was not the 'pendent placement,['] within the meaning of the 'stay put' provision of the Act, 20 U.S.C. § 1415(j)," id. at 2; and (3) "the Hearing Officer's ruling that the IEP that was offered to J.K. for the 2010-2011 school year was timely and appropriate." Id. Plaintiffs also suggest that "should the Court affirm the Hearing Officer's conclusion [as to his lack of jurisdiction to enforce the settlement agreement] . . . the Court [should] assert jurisdiction over the issues pertaining to enforcement of the settlement agreement in this case." Id. at 14. Finally, plaintiffs seek reimbursement for tuition and transportation expenses incurred in connection with J.K.'s enrollment at the Lewis School in 2010-2011. Id. at 2.

---

[6] Though plaintiffs also assert "that the Hearing Officer erred by refusing to admit evidence of the parties' intent with regard to the meaning of the provisions of the settlement agreement that address the timing of the IEP process," Pls.' Br. at 1-2, they present no argument in support of this claim in their brief. We thus will not consider it.

18

As the first determination addressed a pure question of law, we need not consider Hearing Officer Culleton's findings of fact in independently resolving the question.  We also resolve the second question as a matter of law by considering the Hearing Officer's jurisdiction to make his determination.  As for the third determination, plaintiffs concede that "the issue of whether an IEP is appropriate is a question of fact," id. at 9, which indeed it is.  See, e.g., J.E. v. Boyertown Area Sch. Dist., 2011 WL 5838479, at *2 (3d Cir. 2011) ("Whether an IEP is appropriate is a question of fact."); S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 271 (3d Cir. 2003) ("The issue of whether an IEP is appropriate is a question of fact."); Carlisle Area Sch. v. Scott P., 62 F.3d 520, 526 (3d Cir. 1995) ("We review the district court's determination of the 1992-93 IEP's appropriateness, a factual question.").  We will thus defer to this factual finding.

As we have explained, plaintiffs' fourth argument presents us with a matter not for review based upon the administrative record, but rather to be judged under a summary judgment standard.  After considering plaintiffs' challenges to Hearing Officer Culleton's ruling, we will examine whether plaintiffs are entitled to summary judgment based on their

contract claim.  But before turning to any of these arguments, we will first describe the IDEA's requirements pertinent to this case.

**A.    Background on the IDEA**

As our Court of Appeals has rehearsed, "[t]he IDEA requires that states to receive federal education funding make available a free and appropriate public education to all children with disabilities residing within their borders."  Bayonne Bd., 602 F.3d at 556.  This requirement has two prongs: (1) "[a]lthough a state is not required to supply an education to a handicapped child that maximizes the child's potential, it must confer an education providing 'significant learning' and 'meaningful benefit' to the child," id.; and (2) "the IDEA includes a 'mainstreaming' component requiring the placement of a student with disabilities in the least restrictive environment that will provide the child with a meaningful educational benefit."  Id. at 556-57.

With respect to the first element, the Supreme Court has instructed that a court's inquiry

> is twofold.  First, has the State complied
> with the procedures set forth in the Act?
> And second, is the individualized educational
> program developed through the Act's

20

> procedures reasonably calculated to enable
> the child to receive educational benefits?

Rowley, 458 U.S. at 206-07.

The "procedures set forth in the act" revolve around the development of an IEP, a "written statement for each child with a disability" that includes a statement the child's (1) present levels of achievement and performance, (2) measurable annual goals, and (3) special education and supplementary aids and services to be provided to the child, as well as other details regarding the child's educational program. §1414(d)(1)(A)(i). An IEP should be developed by a team that includes the parents of the disabled child, the child's regular and special education teachers, a representative of the LEA, and someone who can interpret the instructional implications of evaluation results. § 1414(d)(1)(B). The team should review the child's IEP annually and revise it as appropriate, § 1414(d)(4), and an IEP should be in effect for each disabled child at the beginning of every school year. § 1414(d)(2)(A). Our Court of Appeals has emphasized that "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation

rights, or causes a deprivation of educational benefits."

Bayonne Bd., 602 F.3d at 565.

The IDEA clearly envisions that parties may enter into settlement agreements that resolve disputes as to a child's entitlement under the Act.  We will examine in the next section such an agreement's impact upon the IDEA's requirements and also a hearing officer's role in ruling on a due process complaint.


**B.**    **The Settlement Agreement and the Hearing Process**

Hearing Officer Culleton "dismiss[ed] the Parents' first request for relief -- the enforcement of the settlement agreement as a contract, for lack of hearing officer jurisdiction."  Culleton's Decision at 11.[7]  Plaintiffs disagree with this conclusion and urge that the IDEA's provisions "should be read together in a manner that recognizes the enforceability of settlement agreements reached through the resolution process in the courts while also fully preserving the right of the parties to obtain a ruling -- including enforcement -- as to any settlement agreement that also relates to the (b)(6) factors" in

---

[7] It bears noting that the Hearing Officer's ruling is divided into findings of fact and a decision.  See Ex. 2 to Admin. R.  For ease of reference, we will refer to his adjudication as his "Decision".

22

administrative hearings.  Pls.' Br. at 14.  The District responds

that "hearing officers have no authority to interpret or enforce

settlement agreements in Pennsylvania."  Def.'s Resp. to Pls.'

Mot. J. on Admin. R. ("Def.'s Resp.") at 14.

    We begin by noting that both the IDEA and case law

demonstrate that parents and LEAs may enter into settlement

agreements to resolve disputes under the Act.  20 U.S.C. §

1415(e)(2)(F) explains that

>    In the case that a resolution is reached to
>    resolve the complaint through the mediation
>    process, the parties shall execute a legally
>    binding agreement that sets forth such
>    resolution and that --
>
>      (i) states that all discussions that
>          occurred during the mediation
>          process shall be confidential and
>          may not be used as evidence in any
>          subsequent due process hearing or
>          civil proceeding;
>
>     (ii) is signed by both the parent and a
>          representative of the agency who
>          has the authority to bind such
>          agency; and
>
>    (iii) is enforceable in any State court
>          of competent jurisdiction or in a
>          district court of the United
>          States.

Section 1415(f)(1)(B)(iii) similarly provides, with respect to

preliminary meetings held prior to a due process hearing, that:

> In the case that a resolution is reached to
> resolve the complaint at a meeting described
> in clause (i), the parties shall execute a
> legally binding agreement that is --
>
>> (I) signed by both the parent and a
>> representative of the agency who
>> has the authority to bind such
>> agency; and
>>
>> (II) enforceable in any State court of
>> competent jurisdiction or in a
>> district court of the United
>> States.

Our Court of Appeals, for its part, has explained in the IDEA context that when a "settlement agreement was voluntarily and willingly entered by the parties," the agreement constitutes "a binding contract between the parties and should have been enforced as written." D.R. v. E. Brunswick Bd. of Educ., 109 F.3d 896, 898 (3d Cir. 1997). More recently, our Court of Appeals emphasized in Ballard, 273 Fed. Appx. at 188 (internal citations omitted), that

> A parent can waive her child's right to a
> FAPE. The fact that Ms. Ballard entered into
> a settlement agreement, which she now
> contends falls short of providing her
> daughter with a FAPE, does not inherently
> violate law or public policy. Parties
> routinely enter into agreements to resolve
> litigation. An agreement is not void because
> a party settled for less than s/he later
> believes the law provides.

24

Under the IDEA and this Circuit's case law, parents may enter into enforceable settlement agreements with LEAs that provide them with more or less the same entitlements that the IDEA provides.  Notably, however, the extent to which hearing officers may consider such agreements in performing their functions under the IDEA remains unsettled.

On the one hand, courts within this District have concluded that "it is within the jurisdiction of a Special Education Hearing Officer to determine whether a settlement agreement exists."  I.K. v. Sch. Dist. of Haverford Twp., 2011 WL 1042311, at *5 (E.D. Pa. 2011).  See also Lyons v. Lower Merrion [sic] Sch. Dist., No. 09-5576, slip op. at 6 (E.D. Pa. Dec. 14, 2010) (Davis, J.) ("[N]either of these provisions [34 C.F.R. §§ 300.506(b)(7) and 300.510(d)(2), implementing the IDEA] precludes a hearing officer from reviewing a settlement agreement's terms.").  As Judge Davis has noted, however, "[w]hether a Hearing Officer has jurisdiction to enforce resolution agreements appears to be an open question in this circuit."  Id.

By contrast, the Second Circuit has squarely held that a hearing officer has "no authority to enforce this settlement agreement -- essentially a contract between the parties," H.C. v. Colton-Pierrepont Cent. Sch. Dist., 341 Fed. Appx. 687, 689 (2d

25

Cir. 2009), though a hearing officer may "consider the settlement agreement to the extent it might have been relevant to the issue before him, i.e., whether H.C.'s 2006-07 IEP provided her with a FAPE." Id. at 690 n.3.  Judge Kobayashi, of the District of Hawaii, has similarly contended that a "Hearings Officer did not have jurisdiction to enforce the Settlement Agreement, [though] the Hearings Officer could have considered the terms of the Settlement Agreement in relation to other issues, such as determining whether Student received a FAPE." Justin R. v. Matayoshi, 2011 WL 2470624, at *13 (D. Haw. 2011).

For many of the reasons Lyons and H.C. enunciate, we agree that a hearing officer lacks jurisdiction to enforce a settlement agreement.  In the first place, Congress in the statute created a particular procedure for enforcing settlement agreements arising out of mediation and resolution processes under the IDEA by making such agreements "enforceable in any State court of competent jurisdiction or in a district court of the United States."  20 U.S.C. §§ 1415(e)(2)(F)(iii), 1415(f)(1)(B)(iii)(II).  As Judge Davis has noted, it is a "well-settled principle that 'if there exists a special statutory review procedure, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review

in those cases to which it applies.'"  <u>Lyons</u>, slip op. at 6-7

(quoting <u>Comp. Dep't of Dist. Five v. Marshall</u>, 667 F.2d 336, 340

(3d Cir. 1981)).  Secondly, regulations implementing the IDEA

permit enforcement of settlement agreements "in any State court

of competent jurisdiction or in a district court of the United

States, or, by the SEA, if the State has other mechanisms or

procedures that permit parties to seek enforcement of resolution

agreements."  34 C.F.R. § 300.510(d)(2); <u>see</u> <u>also</u> § 300.537

("Notwithstanding §§ 300.506(b)(7) and 300.510(d)(2), which

provide for judicial enforcement of a written agreement reached

as a result of mediation or a resolution meeting, there is

nothing in this part that would prevent the SEA from using other

mechanisms to seek enforcement of that agreement.").  This

authorization suggests by its terms that in the absence of "other

mechanisms or procedures" implemented by a state, the exclusive

means for enforcing a settlement agreement under the IDEA is "in

any State court of competent jurisdiction or in a district court

of the United States."  Neither party has suggested that

Pennsylvania has adopted or implemented any such "other

mechanisms or procedures."

        Third, Congress has specifically identified the task

that hearing officers should undertake under the IDEA, explaining

27

that "[s]ubject to clause (ii) [relating to procedural violations of the IDEA], a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education."  20 U.S.C. § 1415(f)(3)(E)(i).  Enforcement of a settlement agreement may determine if parents have waived certain rights under the IDEA, or whether an LEA has contracted to provide certain benefits above those that the IDEA requires, but it is not related to the fundamental question of whether a "child received a free appropriate public education."  Enforcing a settlement agreement thus appears to exceed the authority that the IDEA confers upon a hearing officer.

Finally, as the Second Circuit noted in H.C., 341 Fed. Appx. at 690 (internal quotation marks, citations, and brackets omitted), "resolution of the dispute [relating to enforcement of a settlement agreement] will not benefit from the discretion and educational expertise of state and local agencies, or the full exploration of technical educational issues related to the administration of the IDEA."  The Supreme Court has noted that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," Rowley, 458 U.S. at 208 (internal quotation marks and

28

citations omitted), so accordingly we should defer to state proceedings regarding these questions.  The converse would appear to be true with respect to questions of contract interpretation and enforcement, as to which courts have "specialized knowledge and experience" and hearing officers do not institutionally have any particular expertise.[8]

Judge Davis correctly observed that "state educational agencies seem to consistently enforce settlement agreements in school districts' favors to preclude parents from bringing particular due process complaints, without undertaking analyses of their own jurisdiction." Lyons, slip op. at 7.  The fact that these agencies enforce settlement agreements does not mean that the IDEA authorizes them to do so.  The IDEA's language and the purposes justifying due process hearings suggest that hearing officers lack jurisdiction to enforce settlement agreements -- even those produced through mediation and resolution meetings -- though, to be sure, they may acknowledge the existence of such

---

[8] Indeed, unlike Hearing Officer Culleton, there is no statutory mandate that such officers must be lawyers.  See § 20 U.S.C. § 1415(f(3(A).

agreements and consider them in determining whether a child has received a free and appropriate public education.[9]

We therefore conclude that Hearing Officer Culleton did not err in declining to enforce the parties' settlement agreement.

C.   **J.K.'s Pendent Placement**

We now turn to Hearing Officer Culleton's determination of J.K.'s pendent placement.  Hearing Officer Culleton explained that "[t]he parties both request a determination as to what the pendent placement is for purposes of this litigation.  I conclude that the pendent placement for the Student is Supplemental Learning Support in a public school setting."  Culleton's Decision at 20.  Hearing Officer Culleton reasoned that the parties' settlement "agreement recites the parties' agreement that the pendent placement would be the last program and placement proposed by the parties.  This was the March 2009 IEP,

---

[9] We understand that this conclusion means that in some cases parents may waive their child's right to a FAPE under the IDEA through a settlement agreement, yet a hearing officer may nonetheless be required under 20 U.S.C. § 1415(f)(3)(E)(i) to determine if the child received a FAPE before a district court may consider whether the child retained his or her right to such a FAPE.  While such a process may appear to involve the hearing officer's unnecessary expenditure of time and resources, this is the scheme that Congress has created.

which specifies supplemental learning support in a public
facility." Id. at 21.

     The District justifies Hearing Officer Culleton's
decision by arguing that "the Eastern District has determined
that hearing officers have the authority to review and
acknowledge settlement agreements." Def.'s Resp. at 14.
Plaintiffs reply that the "argument that the Hearing Officer was
able to base his conclusion as to the pendent placement upon
selected language in the Agreement without interpreting the
agreement is simply not logical." Pls.' Reply in Support of
Pls.' Mot. J. on Admin. R. ("Pls.' Reply") at 2.

     We agree not only that Hearing Officer Culleton
interpreted the parties' settlement agreement in determining
J.K.'s pendent placement, but conclude that he impermissibly
enforced it in doing so. 20 U.S.C. § 1415(j) provides that
"during the pendency of any proceedings conducted pursuant to
this section, unless the State or local educational agency and
the parents otherwise agree, the child shall remain in the then-
current educational placement of the child." Section 1415(j)
thus envisions the possibility of a waiver of this stay-put
provision, and we can readily imagine this waiver taking the form
of either (1) a simple agreement between parents and an LEA, or

31

(2) a formal contract.  In the latter case, finding the waiver to be effective necessarily involves enforcement of the contract. See, e.g., Francois v. Hartford Holding Co., 424 Fed. Appx. 138, 140 (3d Cir. 2011) ("Dominican courts . . . will enforce Cardinal's agreement to waive the statute of limitations."); United States v. Williams, 510 F.3d 416, 423 (3d Cir. 2007) ("[W]e routinely enforce plea agreements in which defendants waive important constitutional rights."); Clark v. Vernon, 228 Fed. Appx. 128, 132 (3d Cir. 2007) ("[W]here a person allegedly waives civil rights claims, the court . . . should not enforce the agreement unless its execution was knowing and voluntary.") (summarizing W.B. v. Matula, 67 F.3d 484, 497 (3d Cir. 1995)). While a hearing officer would not err by finding the existence of a settlement agreement between parents and an LEA as to a child's pendent placement, a hearing officer lacks jurisdiction to enforce a written contract if it specifies a child's pendent placement only under certain circumstances.

Here, the parties' September, 2010 settlement agreement provided that "[t]he parties agree that for purposes of this settlement, the District's willingness to enter into the agreement is dependent upon the District being the pendent placement.  This Agreement in no way alters the parties'

32

agreement that pendency remains in the District's last proposed program and placement." Ex. 6 to Admin. R. at P-1 at 5.  Hearing Officer Culleton interpreted and enforced this contract in finding that J.K.'s pendent placement was "Supplemental Learning Support in a public school setting," Culleton's Decision at 20, and he to this extent committed error under the IDEA.

Rather than remand to Hearing Officer Culleton to allow him to determine J.K.'s pendent placement without enforcing the settlement agreement between the parties, we will interpret this provision of the agreement ourselves in Section II.E, <u>infra</u>, and decide whether it constitutes a waiver of the stay-put provision under 20 U.S.C. § 1415(j).

### D.   **The Hearing Officer's FAPE Determination**

We now come to plaintiffs' final challenge to Hearing Officer Culleton's decision with respect to his finding that the March, 2009 IEP the District offered J.K. was timely and appropriate under the IDEA.

Hearing Office Culleton found "that the District offered an appropriate program and placement," Culleton's Decision at 13, concluding that "the March 2009 IEP, when offered again on March 30, 2010, was reasonably calculated to provide

meaningful educational benefit to the Student in the 2010-2011 school year." Id. at 14-15. Plaintiffs respond that the District made "no offer of a new IEP for the 2010-2011 school year" "by means of the March 30, 2010 letter from Dr. Lambert," Pls.' Br. at 17, and further urge that "the placement offered to J.K. per the July 14, 2010 IEP was not shown to be appropriate," since "[i]n order to function in a large school environment, such as the high school, it would be necessary for J.K. to have an individual aide, which would negatively impact on her ability to function independently in that environment." Id. at 18.

Hearing Officer Culleton's finding as to the timeliness of J.K.'s 2010-2011 IEP rested on three premises: (1) "I consider an offer timely if it is conveyed to the parents before any reasonable deadline to commit to the private school which they choose," Culleton's Decision at 14; (2) "that [deadline] was April 30, 2010," id.; and (3) "the March 2009 IEP [was] offered again on March 30, 2010." Id. at 14-15. Plaintiffs challenge only the last of these, arguing that "the statement in Dr. Lambert's letter is clearly a statement of his understanding as to what constitutes the pendent placement under the agreement" and not an offer of a "new IEP." Pls.' Br. at 17. Plaintiffs point to Dr. Lambert's letter as "nontestimonial, extrinsic

34

evidence on the record," S.H., 336 F.3d at 270, that would justify a conclusion contrary to Hearing Officer Culleton's.

But a fair reading of Dr. Lambert's letter reveals that it does not justify plaintiffs' proffered finding.  The letter states that

> At this point in time we do not have sufficient additional data to develop a new IEP other than basically what we had this time last year.  In addition, we are in a dispute over how to proceed.  As such I would like to reiterate that the IEP developed last spring will remain the IEP to be in place for [J.K.] until we get sufficient data to develop a new one.  This IEP details placement in the Intensive Learning Support program.

Ex. 6 to Admin. R. at P-6 (emphasis added).  The letter thus unambiguously presents the March, 2009 IEP as the IEP as of March, 2010, although it leaves open the possibility that this IEP might evolve in the future.

In contrast to plaintiffs' contention, the letter makes no mention of J.K.'s pendent placement.  While this IEP was not "new" in the sense that it was "[n]ot existing before; now made, or brought into existence, for the first time," X Oxford English Dictionary 363 (2d ed. 1989), it was "new" in the sense that it was "[c]oming as a resumption or repetition of some previous act or thing; starting afresh."  Id.  More importantly, plaintiffs

35

have invented the requirement that the IEP for the 2010-2011 year

must be "new".  The IDEA certainly imposes no such stricture,

stating as it does only that "[a]t the beginning of each school

year, each local educational agency, State educational agency, or

other State agency, as the case may be, shall have in effect, for

each child with a disability in the agency's jurisdiction, an

individualized education program." 20 U.S.C. § 1414(d)(2)(A).

As for the appropriateness of the March, 2010 IEP,

Hearing Officer Culleton explained that the District's

> offer in 2010, as stated in the 2009 IEP,
> included speech and language classes, as well
> as social skills training by the District's
> social work department.  Moreover, it
> described in detail how the Student's
> transition would be accomplished, and offered
> virtually any resource necessary to keep the
> Student safe and to attenuate any anxiety,
> while at the same time planning to fade
> supports as appropriate.

Culleton's Decision at 16-17 (citations omitted).  The Hearing

Officer thus found that "the March 2009 IEP, along with the

offered high school location, appropriately addressed the

Student's special education needs as of March 2010, when it was

re-offered to the Parents." Id. at 16.  Plaintiffs respond with

their testimony describing their concerns about J.K.'s "ability

to function independently in that environment." Pls.' Br. at 18

(citing Ex. 3 to Admin. R. at 97-101).  Such testimony does not

constitute "contrary nontestimonial extrinsic evidence on the

record," S.H., 336 F.3d at 270, that would justify our not

deferring to a hearing officer's findings.  We thus conclude that

Hearing Officer Culleton did not err in finding that the March,

2010 IEP was timely and appropriate.

        As to plaintiffs' claim for reimbursement, they assert

that "[t]he IDEA provides that parents of children with

disabilities who place their children in private schools may

obtain reimbursement from the public school district where it is

shown that the public school has failed to make a timely offer of

a free appropriate public education to the child."  Pls.' Br. at

19 (citing 20 U.S.C. § 1412(a)(10)(C)).  Because Hearing Officer

Culleton did not err in finding that the District offered a

timely and appropriate IEP to J.K., plaintiffs' claim for

reimbursement must fail.


        **E.    Enforcing the Parties' Settlement Agreement**

        As we have already noted, plaintiffs state that

> [I]f it is determined that the Hearing
> Office[r] was correct as to the lack of
> jurisdiction, there is no question that the
> Court does have such jurisdiction as is
> specified in the statutory provision
> requiring resolution meetings.  See, 20

37

> U.S.C. § 1415(f)(B)(1) [sic].  Therefore,
> should the Court affirm the Hearing Officer's
> conclusion in this regard, Plaintiffs ask
> that the Court assert jurisdiction over the
> issues pertaining to enforcement of the
> settlement agreement in this case.

Id. at 14.  Since the parties agree that the September, 2009

settlement agreement was reached at a resolution meeting, Stip.

of Facts ¶ 10, we indeed have jurisdiction to enforce it pursuant

to 20 U.S.C. § 1415(f)(1)(B)(iii)(II).  Because we do not, by

exercising this jurisdiction, review any decision by the Hearing

Officer, a motion to enforce a settlement agreement under the

IDEA based upon record evidence is better treated as a motion for

summary judgment and not a motion for judgment on the

administrative record.  We therefore need pay no deference to

Hearing Officer Culleton's findings of fact.

Instead, we will accept the parties' undisputed facts

and consider the factual allegations that each party has

supported with citations to the record.  In fact, we need only

supplement the undisputed facts with the settlement agreement

itself and plaintiffs' supported allegations as these facts alone

demonstrate that plaintiffs are not entitled to relief.

As we have noted, our Court of Appeals has explained in

the IDEA context that when a "settlement agreement was

38

voluntarily and willingly entered by the parties," the agreement constitutes "a binding contract between the parties and should have been enforced as written." <u>D.R. v. E. Brunswick Bd. of Educ.</u>, 109 F.3d 896, 898 (3d Cir. 1997).  As a consequence, the appropriate law to apply to such a claim is simply the state law of contract.  <u>See</u>, <u>e.g.</u>, <u>Robert v. Cobb Cty. Sch. Dist.</u>, 279 Fed. Appx. 798, 801 (11th Cir. 2008) ("Plaintiffs prevailed only on a state-law breach of contract claim . . . . [P]laintiffs' breach of settlement agreement claim did not require any adjudication of plaintiffs' rights under the IDEA."); <u>Bowman v. Dist. of Columbia</u>, 2006 WL 2221703, at *1 (D.D.C. 2006) ("Although the parties' underlying dispute [involving enforcement of a settlement agreement] relates to and touches on the IDEIA, the complaint, ultimately, is a simple breach of contract claim. Breach of contract claims are governed by state law.") (internal citations omitted).  Pennsylvania law "requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages.'"  <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 225 (3d Cir. 2003) (quoting <u>CoreStates Bank, N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Plaintiffs allege that the District breached its duties under the September, 2009 settlement agreement by failing to (1) begin the IEP development process before November 30, 2010, Pls.' Br. at 12, 15-17; and (2) offer an IEP by March 30, 2010.  Id. at 17-18.  The settlement agreement merely provides that "the parties agree to reconvene the IEP team on or before November 30, 2009 to discuss transition activities during the 2009-2010 school year," and that "the IEP team will develop a draft IEP and hold an IEP meeting no later than March 30, 2010 to determine an appropriate program and placement."  Ex. 6 to Admin. R. at P-1 at 5 (emphasis added).  One cannot fairly read this language to impose a duty only on the District to convene the IEP team or develop a draft IEP.[10]

Plaintiffs seek to introduce testimony suggesting that (1) they "expected that they would be contacted by the district prior to the November 30, 2009 date, in light of the fact that the District typically did initiate IEP meetings," Pls.' Br. at 6 (citing Ex. 5 to Admin. R. at 79-80); and (2) "[t]he timelines specified in the settlement agreement for the creation of an IEP

---

[10] It bears repeating, moreover, that we have already concluded that Dr. Lambert's March 30, 2010 did constitute an offer of an IEP.  See Section II.D, supra.

for the 2010-2011 school year were critical to the parents

because they needed sufficient time in which t[o] consider the

proposed IEP before having to decide whether to enroll J.K. in

the Lewis School for that year." Id. at 5-6 (citing Ex. 5 to

Admin. R. at 77-78).  With respect to plaintiffs' expectation --

not memorialized in the agreement -- that the District would

contact them, it is important to note that the settlement

agreement provides that "[t]his agreement constitutes the entire

agreement and understanding between the parties."  Ex. 6 to

Admin. R. at P-1 at 8.  Moreover, the contract itself evinces no

ambiguity as to whether the District is to be solely

responsible[11] for convening the IEP team and developing a draft

IEP.  To the contrary, the contract plainly states that "the

parties" or "the IEP team"[12] will perform these tasks.  As our

Court of Appeals has explained, "Pennsylvania's parol evidence

rule mandates that when a written contract is clear and

---

[11] It bears noting that the agreement elsewhere states
that "the District will be provided with ten (10) days from the
date of receiving written notification . . . to reconvene the IEP
team," Ex. 6 to Admin. R. at P-1 at 2, suggesting that the
parties knew how to impose an express obligation on the District.

[12] The settlement agreement does not define the term
"IEP team."  As we have observed, the IDEA provides that the "IEP
team" includes a disabled child's parents.  See supra note 3.

41

unequivocal, its meaning must be determined by its contents alone." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 594 (3d Cir. 2009) (citing E. Crossroads Ctr., Inc. v. Mellon-Stuart Co., 205 A.2d 865, 866 (Pa. 1965)).   We thus will not consider testimonial evidence as to plaintiffs' expectations in entering the contract in construing the provision that delineates the timetable for drafting an IEP.

Plaintiffs seek to introduce the second type of testimonial evidence -- concerning their view that the timetable was critical to the agreement as a whole -- to support their claim that "the Parents' agreement with the designation of the District's proposed placement as the pendent placement is clearly dependent upon the District's compliance with the provision requiring completion of the IEP process by March 30, 2010." Pls.' Br. at 16-17.   It is true that Pennsylvania courts have "long recognized the established precept of contract law that a material breach of a contract relieves the non-breaching party from any continuing duty of performance thereunder." LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 648 (Pa. 2009).   We reiterate that we have already held that the District did propose an IEP by March 30, 2010.   Moreover, even if we momentarily put aside this conclusion, no breach of the contract

42

could have resulted from the District's failure to convene the
IEP team by November 30, 2009 or from the alleged failure to
proffer an IEP by March 30, 2010 as the contract did not impose a
duty on the District to accomplish these tasks.  Consequently,
the result that plaintiffs suggest should follow from a breach --
the invalidation of the pendent placement provision -- does not
obtain.

We have already explained that Hearing Officer Culleton
lacked jurisdiction to enforce the parties' settlement agreement
and hence its pendent placement provision.  <u>See</u> Section II.C,
<u>supra</u>.  Plaintiffs have admitted, however, that they entered into
an agreement with the District "which provides that the pendent
placement will be the then [sic] last placement offered by the
District."  Pls.' Br. at 15.  Plaintiffs have failed to
demonstrate any genuine dispute as to the material question of
whether the District breached the settlement agreement so that
not only are they <u>not</u> entitled to summary judgment on their
breach of contract claim, the District would be entitled to
summary judgment had <u>it</u> so moved.  In the absence of evidence
suggesting the pendent placement provision's invalidity, the
District's March, 2009 IEP was the pendent placement.

43

**F.   Further Resolution of Plaintiffs' Claims**

While we have agreed with plaintiffs' challenge to
Hearing Officer Culleton's enforcement of the pendent placement
provision of the September, 2009 settlement agreement,
plaintiffs' victory proves ultimately to be Pyrrhic.  Our own
examination of plaintiffs' contract claim demonstrates the
pendent placement provision's validity in the absence of further
evidence.  We have rejected plaintiffs' other challenges to the
state educational agency's decision.

We have also denied summary judgment to plaintiffs on
their contract claim while noting that, had the District been the
movant here, we would have granted summary judgment on this claim
to it.  While there is precedent supporting a grant of summary
judgment where a court denies a plaintiff's motion for judgment
on the administrative record and the defendant has filed no
cross-motion, see, e.g., Drake P. v. Council Rock Sch. Dist.,
2011 WL 2174969, at *1 (E.D. Pa. 2011) (DuBois, J.), Fed. R. Civ.
P. 56(f)(1) suggests that a court may "grant summary judgment for
a nonmovant" only "[a]fter giving notice and a reasonable time to
respond."

Moreover, the parties have not briefed us on
plaintiffs' claim under § 504 of the Rehabilitation Act or their

44

claim for attorney's fees and costs.  To be sure, our investigation of the case law suggests that based on our conclusions today, we must deny these claims.  <u>See</u>, <u>e.g.</u>, <u>Lauren V. v. Colonial Sch. Dist.</u>, 2007 WL 3085854, at *14 (E.D. Pa. 2007) (Hart, Mag. J.) (suggesting that if a school district fulfills the provisions of the IDEA, its responsibilities under § 504 are also fulfilled).

We will accordingly instruct plaintiffs to show cause why we should not dismiss their claims with prejudice and close this case.  We will also invite briefing from the District on this topic.

BY THE COURT:


__\s\Stewart Dalzell